**In the Matter of BRATEN APPAREL CORPORATION, Debtor.**

**Bankruptcy No. 74 B 1256 (PBA).**

United States Bankruptcy Court, S.D. New York.

Jan. 16, 1987.

See also, 2nd Cir., 742 F.2d 1435.

Garrity, Connolly, Lewis, Lowery & Grimes by James L. Garrity, New York City, for debtor.

Moses & Singer, by Richard W. Brewster, David M. Satnick, Arnold Jaffe, New York City, for Bankers Trust Co.

**MEMORANDUM DECISION ON OBJECTION TO CLAIM NO. 189, BANKERS TRUST COMPANY**

PRUDENCE B. ABRAM, Bankruptcy Judge:

A blinding salt spray has been thrown up over many years by the angry sea of litigation and accusation which has been brought about by the objections of the debtor, Braten Apparel Corporation ("Braten" or "Debtor"), to the claim of Bankers Trust Company ("Bankers" or "Bank"). Fortunately, the Uniform Commercial Code proves itself to be a worthy vessel in which to weather this commercial storm.

Braten asserts that the entire unsecured or deficiency portion of Bankers' claim must be disallowed because the Bank's inability to account accurately for its collection of Braten's accounts receivable,[1] as

___

1. In support of this contention, the Debtor points to the July 1979 letter to a Bank officer

well as certain alleged deficiencies in the collection process, establish that the Bank did not act in a commercially reasonable manner as required by the New York Uniform Commercial Code (hereafter the "UCC"). Braten also contends that Bankers failed even to attempt to liquidate a substantial quantity of returned merchandise inventory in its possession. Although Bankers concedes that it cannot provide the detailed accounting sought by the Debtor, it states that it can provide an accurate statement as to its aggregate collections. The Bank contends that its right to a deficiency claim is not barred by its less than perfect recordkeeping and that the aggregate proceeds it received, when weighed against the receivables available to be collected, establish that the Bank's collection effort was commercially reasonable and that the full deficiency claimed should be allowed. Further, Bankers states that it liquidated all of the returned merchandise inventory made available to it by the Debtor and that, if any additional inventory actually existed, Braten sold it and improperly retained the proceeds.

This court heard testimony on these issues over eight days.[2] No useful purpose would be served by more than brief review of the last steps in the torturous procedural path by which this matter came to trial. By way of order to show cause dated October 12, 1982, the Debtor sought to have Bankers' claim in the amount of $4,628,835.57 disallowed on the grounds that it remained unliquidated and incapable of reasonable estimation eight years after commencement of the case and was delaying the administration of the estate. Bankers opposed the disallowance of its claim and requested the matter be set down for an early trial in light of the extensive discovery already conducted. On November 4, 1982, the Debtor restated its objection in the form of a complaint and also sought an affirmative judgment in the amount of $2.5 million, which was stated to represent the difference between the amount owing to the Debtor from Bankers and any amount owing to Bankers.

The court's findings follow. As a result of the trial, the court has concluded that there are two primary legal questions posed. The first question is how detailed an accounting is required to be made by a secured party as a basis for obtaining a deficiency judgment. This court holds that a summary accounting is insufficient and that a secured party must also provide an accounting as to its disposition of each account receivable. The second question follows from the first. It is to what extent is a secured creditor's deficiency claim barred when its accounting is found to be insufficient. This court finds that the secured creditor's claim is barred only to the extent of any presumptive loss caused by the lack of a detailed accounting. The court finds that Bankers has not provided the required accounting and that the presumptive loss is the difference between the net face amount of the receivables and the actual collections.

---

admitted into evidence in which the Bank's counsel stated that the Bank's records relative to the status of collection of the Debtor's accounts were in a state of "utter confusion" which could "never be untangled" and that the Bank had been unable to prepare a complete and accurate account of the collection of Braten's accounts receivable.

2. The court directed that the trial be limited to the following four issues:

    (a) The amount owing by Braten to Bankers, exclusive of interest, under the Revolving Loan and Security Agreement dated March 31, 1971 (the "Loan Agreement");

    (b) The principal amount owing by Braten to Bankers under its "Own Paper Loan";

    (c) The amount of accounts receivable of Braten seized by Bankers and whether collection and disposition of such accounts by Bankers was conducted in a commercially reasonable manner, and the amount of returned merchandise of Debtor seized by Bankers and whether the receipt, sale and disposition of that merchandise was conducted in a commercially reasonable manner;

    (d) A determination of the minimum deficiency which should be allowed to Bankers under the Loan Agreement and on the Own Paper Loan.

On the first day of trial, the court determined that Debtor's claim that Bankers charged it excess interest should be heard at a later date.

As to the returned merchandise claim, the court finds that the Debtor failed to prove that Bankers ever took possession or exercised control over the restocked returned goods in issue. The court further finds that the Debtor sold the goods for not less than $500,000 following the Chapter XI filing and that it must account to Bankers for this amount.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was commenced by Braten, a manufacturer of men's apparel, on September 5, 1974, when it filed a petition for arrangement under Chapter XI of the former Bankruptcy Act.[3] The schedules of

3. A plan of arrangement for Braten was confirmed on March 12, 1976 under which unsecured creditors received 17-½% of their allowed claims. Subsequently in September 1976, Bankers moved to set aside the confirmation on the grounds that Braten had fraudulently concealed its ownership interest in Brookfield Clothes, Inc. ("Brookfield"). The confirmation was set aside in June 1982. See *In re Braten Apparel Corporation,* 21 B.R. 239 (Bankr.S.D.N.Y.1982), affirmed, 26 B.R. 1009 (D.C.S.D.N.Y. 1983). An involuntary petition under Chapter 11 of the present Bankruptcy Code was filed against Brookfield on August 30, 1982 and an order for relief was entered with Brookfield's consent. Almost immediately Brookfield's financial condition caused it to cease its operations and its assets were sold. See *In re Brookfield Clothes, Inc.,* 31 B.R. 978 (D.C.S.D.N.Y. 1983). No plan has been proposed in the Brookfield case and it is unlikely that its creditors will be paid in full on their claims.

4. In the July 27, 1979 decision of the New York Supreme Court, New York County in *Braten Apparel Corporation v. Bankers Trust Company* and *Bankers Trust Company v. Clarence Rainess Co.,* Index No. 02961/75 and 08295/76, the court stated that statements concerning Braten's financial condition as of July 31, 1974 reflected a loss of approximately $2.7 million. As the previous financial statement of March 31, 1974 had indicated a profit of $150,000, it appeared that between these dates Braten lost $2.85 million.

5. Bankers is also owed other sums, including overdrafts on Braten's checking account. However, those amounts are not being fixed at this time.

6. This total agrees with the schedules filed by the Debtor on September 5, 1974 and sworn to by its president, Milton Braten ("Milton"). Schedule A-2 states that Bankers has a claim of

assets and liabilities annexed to the Chapter XI petition reflected total liabilities of slightly in excess of $6.2 million and total assets of just less than $5.7 million. The petition was precipitated when Bankers called its outstanding loans on or about August 26, 1974 when it learned that Braten was insolvent.[4] The loans[5] totalled $3,875,000 comprised of (a) $3,450,000 due under a revolving credit line secured by Braten's accounts receivable established by a Loan and Security Agreement (the "Loan Agreement") dated March 3, 1971; and (b) $425,000 due on a 90–day Own Paper Loan which had most recently been renewed on July 1, 1984.[6]

$3,450,000 secured by accounts receivable having a face value of approximately $2,238,553.57 "of which approximately $2,000,000 is deemed collectible." The same statements also appear on Schedule B–2(p). Schedule A–3 reflects an unsecured claim in favor of Bankers of $425,-000. The liabilities to Bankers account for 62% of scheduled claims.

A year and a half later, on March 8, 1976, Milton verified an amendment to the B–2(q) and (t) schedules, which included the following statement:

"The schedules filed at the inception of this proceeding specified dollar amounts of accounts receivable and inventory figures as of July 31, 1974 and other figures, based on figures stated by Clarence Rainess & Co., which were erroneous. The schedules also make erroneous reference to an assignment of accounts receivable to Bankers Trust Company.

"The schedules as originally filed are to be deemed amended to the extent that they are inconsistent with the figures and facts stated in subsequent papers in this proceeding and in the proceedings in other courts referred to hereinabove."

The court authorized this amendment without notice to Bankers by order dated March 9, 1976.

Milton also confirmed the $3,875,000 figure in his trial testimony. The dispute which has been created over this point is ludicrous. It is undisputed that all of this amount was due when Bankers called the loans. Between that date and the September 5 filing date, Bankers collected and held the monies that came into the lockbox. Braten has been insistent that as a result of the Bank's retention of those monies the outstanding loans were reduced. The issue is one of no practical significance as the Bank has always given Braten credit for those monies and the matter only concerns how the accounting is formatted, not its result.

Although Bankers made various advances to or for the benefit of Braten after the loans were called, including for payroll, Bankers did not continue to finance Braten's receivables after the Chapter XI filing and Braten thereafter obtained receivables financing from another lender. Post default and pre-petition, Bankers received payment on Braten receivables through the existing lock-box arrangement. Bankers continued to collect the pledged receivables post-Chapter XI with the knowledge and acquiescence of Braten.[7]

A major focus of the trial was a battle of the experts over the reasonableness of the Bank's collection effort with respect to the receivables. Bankers' expert, Monroe Lazere ("Lazere"), the president of Lazere Financial Corp. ("Financial"),[8] was of the view that Bankers' collection effort was an "extraordinar[il]y effective effort." Transcript, 12/10/82 at 448. Lazere, who is the author and editor of *Commercial Financing*, a widely used textbook, arrived at this opinion on the basis of the following factors:

(i) Bankers' collection of approximately $1.8 million [9] represented approximately 79% of the total outstanding receivables of approximately $2.3 million shown in Braten's August 31, 1974 receivables ageing;

(ii) Braten's return experience in 1974 reflected a dilution of the accounts receivable of approximately 16.9% and thus a return of approximately $83 for every $100 of outstanding receivables could be projected;

(iii) Additional dilution of the accounts receivable portfolio resulting from account debtors who take advantage of debtors who are in insolvency proceedings;

(iv) The high percentage of receivables (approximately 29%) reflected in the August 31, 1974 ageing which were already stale by virtue of then being 90 days or more old;

(v) The total number of open accounts, which amounted to approximately 1,400, that had to be pursued to effect collections;

(vi) The additional dilution of the receivables resulting from general economic conditions prevailing in 1974, a recession year.

Although Lazere based his opinion primarily on the results achieved by Banker' collection effort, Lazere detailed the steps which should be taken in a collection effort. These steps are:

(i) obtain the accounts receivable ledgers from the debtor or the debtor's service bureau;

(ii) put the account debtors on a notification basis to obtain control of the receivables, particularly if the debtor would be receiving financing for its post-filing receivables from another lender;

(iii) analyze the accounts receivable and create collection files in order to commence dunning the account debtors;

(iv) maintain collection files; and

(v) assign sufficient collectors to the collection effort.

Lazere opined that implementation of these steps would take time. In his view, the delay of approximately 25 days that occurred before Bankers' collection effort got underway was not unreasonable. He

---

**7.** The Debtor has asserted that Bankers' collections of the accounts receivables was in violation of the stay provided by former Bankruptcy Rule 11–44. No order was entered vacating the stay. Given the extensive other litigation involving the parties, this court can only conclude from the absence of litigation on this issue that no one, including the Debtor, thought at the time that such an order was required or that the issue was of any significance. This court finds no reason to further consider this point as Bankers admits that it must account to the court for all amounts received by it.

**8.** Financial is an asset-based lender with $100 million in outstanding loans. About 10% of its loan portfolios is accounts receivable financing in the apparel industry.

**9.** The precise amount of the collections made by Bankers on the Braten receivables on which it held a lien is in dispute. See discussion *infra.* Exclusive of amounts collected that belonged to Braten's new lender, the total collected was approximately $1,786,000.

thought it was unlikely that a delay of this magnitude could have materially affected the collection effort, considering, among other things, the degree to which the portfolio was already past due.

As might be expected, the Debtor's expert, Williams Stavrakos ("Stavrakos"), a former credit manager of Kaiser Roth Corporation, an apparel manufacturing concern, opined that Bankers' collection effort was not commercially reasonable. Stavrakos reached this conclusion principally on the assumption that Bankers' collection of $1.8 million represented approximately 50% of the $3.8 million in gross outstanding receivables. The amount of the receivables is crucial to Stavrakos' conclusion because Stavrakos agreed that if receivables were $2.3 million, as Lazere assumed, "it would be a reasonably good collection job." Trial Transcript, 1/27/83 at 1176. Thus, both Lazere and Stavrakos are in agreement that Bankers' collection of approximately $1.8 million was a good collection effort as judged by the total amount collected if the amount of receivables to be collected was in the $2.3 million range.

Stavrakos reviewed photocopies of over 1,000 collection files prepared and used by Bankers in its collection effort looking to see how the collection effort was conducted and whether or not the file came to a conclusion. He found it impossible to determine whether an account had been paid. He found no cash runs to show the amounts received and how they were applied. Indeed, when Stavrakos completed his review of the files he found payments of only $859,548 indicated, an amount which is less than half the amount Bankers has admitted collecting. He found no files for 425 of the 1486 open accounts listed on the August 31, 1974 receivables reports. He determined that 692 of the files were incomplete. Stavrakos was not advised of Bankers' system of marking the files with a yellow marking pen and those marks were not visible on the copies of the files he received. That and the sending of files out to collection agencies could account for

some of the insufficiencies he found. The originals of the collection files have disappeared and were lost several years before trial when the files were sent to an outside service for duplicating.

Stavrakos expressed the opinion that Bankers started its collection effort several weeks later than it should have. He also was of the view that the effort should have been staffed with four experienced collectors, not merely two collectors with minimal experience, as it was.

There is no credible support in the trial record for the proposition that Braten's accounts receivable were in the amount of approximately $3.8 million, as the Debtor alleges and Stavrakos assumed. Debtor's efforts to cause this court to accept a $3.8 million figure for the receivables are nothing short of disingenuous. The $3.8 million figure is merely the gross amount of receivables shown on an ageing report which clearly reflects that the amount of $1.5 million for unallocated credits must be deducted from that amount to reach the actual amount of the receivables, which are approximately $2.3 million.[10]

By letter dated July 31, 1974, Braten certified as required by the Loan Agreement to Bankers the gross amount of the Debtor's receivables and stated the amount to be $2,356,197. In its schedules filed on September 5, 1974, Braten stated its receivables to be in the amount of $2,238,553.57. This later number ties in directly to the figures shown on the ageing schedules as of August 31, 1974 run on September 5, 1974 for Braten and its Braxton and Royal J divisions. This court accords no weight to Milton's amendment to the schedules, even though sworn, because it is equivocal on this point and because the parties were by then in the midst of heated battle.

That Bankers caused initial demand letters to all account debtors to be prepared on the basis of $3.8 million, the so-called gross number, is also irrelevant. The proof established that at the time the no-

---

10. It is unclear but irrelevant why the ageing report is prepared in this fashion. The reason for this format may be as simple as that was the format of the service bureau's computer program.

tices were sent no reliable net numbers were available. It is evidence of no more than prudent conduct to ensure maximum collections given the then state of available information. Likewise, this court does not find evidence of minor collections on a few accounts in excess of the net receivable to warrant the conclusion that the Debtor's accounts receivable should be valued at gross, rather than net.

A major source of difficulty for Bankers from the beginning was Braten's computer service bureau. In order to get Braten's August 31, 1974 receivables ageing, Bankers had to pay Braten's computer service bureau for its overdue bills. The August 31, 1974 ageing was not received by Bankers until on or about September 15, 1974. Two days later and on or about September 17, 1974, Bankers sent out to the listed account debtors a document headed "Important Legal Notice" which advised the account debtors of Bankers' lien and requested that payment of outstanding amounts be made to Bankers.

Philip Pergolizzi, a vice president in Bankers' factoring division, had been put in charge of the receivables collection process on or about September 12, 1974. A week after the Important Legal Notices went out and on or about September 24, 1974, Pergolizzi (the "Supervisor") assigned two collection men (the "Collectors") to the Braten matter.[11] The Collectors, who at the time had only minimal experience, were sent to 1775 Broadway where Bankers' finance division was located to establish a base of operation for the collection of the Braten receivables.

Once at 1775 Broadway, the Collectors divided up the collection files between themselves. A typical collection file contained a past due statement which listed invoice date, invoice numbers, specific invoice amounts, an ageing and a listing of the account balance, a tear sheet as of September 5, 1974 listing specific debits and credits on the account, a collection top sheet which identified the name of the account debtor, a local address, city and state and a phone number. The past due statements contained in the typical collection file were generated by Braten's outside computer service for September 5, 1974; October 3, 1974; as well as one or two other dates in early 1975. Each statement provided up-to-date information. The information forming the basis of the post-September 5, 1974 past due statements was generated by the Collectors from their daily notations on the collection sheet contained in each collection file. The information noted on the collection sheet would be placed on a tear sheet, also contained in the collection file, which was then sent to the computer service.

The Collectors kept a daily tally on monies received on the Braten accounts and communicated daily with the Supervisor. The daily report was transmitted either in writing or orally to the Supervisor and contained summary net figures. The Collectors also prepared weekly written reports of the week's cash receipts, and cumulative totals since their involvement in the Braten collection effort. This summary report contained lump sum net figures.

At one stage in their efforts, the Collectors prepared a report for a meeting with Bankers' auditors to determine the collectibility of open receivables as of that point in time. The report detailed specific account debtors and estimated the amount owing and the collectibility of that outstanding balance. The Collectors were assisted during the course of their collection effort by a full time bookkeeper and had access to a typing pool at the Bank's factoring division.

The procedures used by the Collectors had been established by the Supervisor in the latter part of September 1974 based on his opinion of Braten's prior collection effort on the accounts receivables, the credit viability of specific customer and initial re-

---

11. Bankers' collection effort was characterized at trial by one of its former employees as a hybrid effort in that an accounts receivable finance loan was being handled on a workout basis by the factoring division which was a first time situation. Testimony of Jack Kantrowitz, Trial Transcript 12/11/82 at 862–863.

plies to the first legal notices that went out.

The procedure set up was that any written communication from Braten's account debtors, whether received directly or forwarded to Bankers by Braten, would be held in separate files, with one copy in a bulk file and one attached to the pertinent individual collection file. The Supervisor instructed the Collectors to keep a running record of exactly what transpired on each and every account, both with regard to returns, cash received, deductions made and any other event that transpired with regard to the collection of receivables on the specific accounts. The Supervisor also instructed the Collectors to follow certain priorities in sifting through accounts. Immediate emphasis was placed on the bigger dollars where there was more past due than others. The Supervisor gave the Collectors instructions and directions with regard to the course of action taken, direction on how to proceed to effect collection on specific accounts based upon replies either written or oral from Braten customers, and was available to handle the problems that arose up daily. Throughout the course of the day there was constant and frequent communication between the Supervisor and the Collectors with regard to problems that developed.

The Supervisor gave authorization to both the Collectors to use their best judgment to grant allowances within a set dollar amount while attempting to collect monies from account debtors. The Supervisor, based upon the recommendations of the Collectors, authorized allowances when the allowances exceeded the limit the Collectors were permitted to grant and also determined whether and which accounts would be sent to collection agencies.

On October 8, 1974, Braten agreed to assign Arthur Rosenthal, Braten's credit manager, to serve as accounts receivable liaison to the Bank. In particular, Rosenthal procured necessary documents for Bankers from the Debtor's files to verify deliveries and the like.

On November 21, 1974, Milton executed a letter addressed to all Braten's customers authorizing and directing them to make payment on Braten invoices for sales up to and including September 5, 1974 directly to Bankers. Bankers then mailed the letter to Braten's customers. The letter also revoked Braten's prior instructions to its customers to remit payment to Erwin Commercial Corporation, the pseudonym under which Bankers had maintained the Braten lock box.

Numerous internal memorandums prepared by Bankers were introduced into evidence. They establish that Bankers actively pursued and monitored the collection effort. Meetings were held with the Debtor. Specific problems were addressed. Running tallies of collections were stated.

Braten secured its post-petition financing from Rusch Factors. As many of Braten's prior customers continued to be customers after the Chapter XI filing, there were occasions when Bankers and Rusch received payments belonging to the other. James Sheridan, Bankers' vice president in charge of the accounts receivable finance division, arranged for an inter-creditor agreement between Bankers and Rusch which provided for weekly exchanges.

Bankers continued its collection efforts on the accounts receivable for many months. Pursuant to an agreement dated as of November 25, 1975 and approved by the court on December 4, 1975, Bankers and Braten agreed that Braten would take over the collection of all remaining accounts receivable and the proceeds would be divided as set forth in the agreement. A detailed list of open receivables placed for collection was attached as an exhibit. The stipulation also contained provisions respecting sale by Braten of certain returned merchandise.

At trial the Bank offered as its accounting of its accounts receivable collection effort its loan ledger cards and a summary prepared from them. Applicant's Exhibits 3 and 5. The summary reflects total cash receipts of $1,786,486.06 less no good customer checks of $6,869.88 and collection expenses of $53,413.02 for net cash collections of $1,726,203.16. A summary or oth-

er analysis of the loan ledger cards is required because the cards are in the form of a running tally and are extremely difficult to read and follow. The only other documents in evidence of significance that provide an accounting are two affidavits by Anthony V. Kessler, an Assistant Vice President of Bankers, sworn to on September 7, 1979 (the "First Kessler Affidavit") and on November 9, 1979 (the "Second Kessler Affidavit"). The First Kessler Affidavit contains an analysis of the ledger cards and concludes that the net cash to be applied to the outstanding loan balance as of December 31, 1977 was $1,719,021.12. The Second Kessler Affidavit expands on the first. In particular, it includes a schedule captioned Assigned Accounts Receivable Reconciliation that starts with total outstanding receivables of $2,531,347 and concludes that there is an unexplained balance of only about $13,000 after deductions are made for actual cash collected, agency and other write-offs and allowances. Lists of the agency and other write-offs and the allowances are attached as exhibits. This reconciliation starts from the faulty premise that actual cash collected was $1,877,971. That number is the total of all cash received by the Bank, including about $100,000 collected on receivables pledged to Rusch which was turned over to Rusch. Thus, the unexplained balance is actually well in excess of $100,000.

There was no credible evidence adduced at trial that established that Bankers received any monies for which it did not credit Braten in some fashion. Certain of the variances in the numbers provided by Bankers at different times are explainable by the difference in time at which the accountings were made and others by the meaning of the information. However, in the final analysis, this court finds that the summary accountings provided by Bankers do not in fact report or categorize the underlying information in an understandable, appropriate or verifiable form. The evidence indicates that the Bank maintained numerous underlying records apparently sufficient for its own purposes. For reasons not readily apparent to this court, Bankers has never been able to present the information shown in those underlying records with sufficient consistency or skill that the numbers are defensible against the attacks of this Debtor.

The Debtor's assertions of the Bank's failings with respect to the handling of restocked returned merchandise was also a major subject at the trial. Prior to the default and by custom and usage between the parties, Braten was permitted to and did restock all returned merchandise after it was freshened up by pressing, repacking and the like. The restoration to stock of returned merchandise was a logical business choice since there was no inventory lien other than the one held by Bankers in returned merchandise and the most profitable way to realize on returned merchandise was for Braten to resell it, if possible, in the ordinary course of business.[12]

Braten began to experience heavy returns in late 1973 due to a poor retail business climate. In January 1974, Braten discussed the problem with Bankers because Braten wanted the Bank to accede to its proposal that the returns be accepted even though Braten could have refused to accept them on the grounds the sales had been outright. Braten had concluded that it was better to accept the returns because it believed that it was in a win-the-battle-but-lose-the-war situation because if it did not accept the returns customers would terminate their ongoing relationships with Braten. Most of the returns were fall and winter goods for which Braten's main selling season was August, September and October.

For all practical purposes, there was no means to identify returned merchandise reprocessed and returned to stock from the balance of the inventory. Braten main-

---

12. Overadvances would occur as a result since, unless the resales of returned merchandise were excluded from the borrowing base, the lender would have made two advances against the same merchandise. When returns are modest, this problem is unimportant as a practical matter. However, it seems likely that this was a significant factor in this case because of the very substantial returns experienced by Braten in late 1973 and early 1974.

tained no perpetual inventory records that would have simplified the search. There were various papers, including manufacturing records, that depending upon the garment and original purchaser might have enabled one diligent enough to persevere and trace through a paper trail and a mass of garments to identify at least some of the restocked returned merchandise.

Braten's inventory was located in South Carolina, principally at its warehouse in Williamston, South Carolina. The schedules list inventory consisting of piece goods, work in process and finished goods for men's sportswear of approximately $3.6 million at cost or market, whichever is lower, as of July 31, 1974.

Milton testified that about $2.5 million of the inventory was restocked returned goods. There is some uncertainty in the record as to whether his $2.5 million figure is based on the lower of cost or market, or calculated on some other basis. However calculated, it is evident that returns comprised a substantial percentage of existing inventory, almost 70% if the two figures are directly comparable. The existence of the credit figure of over $1.5 million on the ageing report discussed above is corrobative of very substantial returns. Of the total credits shown on that report, almost $750,000 is reported as over 90 days old which would also be indicative that the returns were winter-weight goods.

It is evident that Braten would have had grave difficulty even attempting to continue in business after Bankers called its loan if Bankers had asserted its lien on 70% of Braten's inventory. Milton testified that Braten used a $100,000 tax refund to fund its Chapter XI operations until its new factor was in place. The Debtor introduced an internal Bank memorandum dated September 30, 1974 that describes a September 19, 1974 visit to the South Carolina warehouse and states that Braten had made significant off-price sales since the filing of the petition consisting of approximately 30,000 units at an average price of $3–4 per unit.

Milton testified at trial that in the weeks after the default, he spoke to officers at the Bank about the restocked returned merchandise and asked what the Bank's intentions with respect to it were. This court finds that Milton is either mistaken in his recollection of the conversations or the words used by Milton were insufficient to convey to Bankers that Milton was talking about the restocked returns rather than the segregated post-Chapter XI returns.

The evidence revealed the following about Bankers' activities respecting Braten's inventory after the default was declared. Immediately after that John Duncan, a Bankers' vice president, visited Braten's South Carolina warehouses and inspected the inventory and Braten's books and records pertaining to the inventory. A second inspection at the South Carolina warehouse was made by Bankers on or about September 20, 1974 in the company of Braten's controller. About the same date, Braten obtained an insurance policy insuring the inventory for only $1.1 million. Milton testified that he told Rabinowitz of Bankers in a telephone call of the amount of the policy and that Rabinowitz stated that amount was insufficient to insure Bankers' interest in the inventory. Thereafter, on or about September 24, 1974, the evidence showed that Bankers purchased additional insurance in the amount of $2.35 million naming itself and Braten as insureds. Given the $3.6 million valuation for the inventory that had been shown in the Debtor's schedules, the purchase of additional insurance by the Bank was reasonable and prudent as the Bank accounted for in excess of 60% of scheduled liabilities.

On September 24, 1974, Jack Kantrowitz, then a Bankers' employee,[13] went to South Carolina to take charge on behalf of Bankers of returned merchandise and manage merchandise chargebacks on the accounts receivable assigned to Bankers. Kantrowitz was unequivocal in his testimony that he understood his role to be take control of only merchandise shipped before but re-

---

13. In 1979, Kantrowitz was hired by Milton. Six months later he was employed by a compa-

ny owned by Milton and remained so employed at the time of trial.

turned after September 5, 1974, the Chapter XI filing date. He testified that the Braten personnel at the warehouse shared his understanding and that he was never advised by the Braten personnel that any returned merchandise other than the some 50–100 boxes of returned goods to which he was directed, and which were ultimately included in a January 1975 auction, were being held for Bankers or subject to Bankers' lien. He stayed until January 1975. During that time he regularly communicated with Bankers' personnel in New York.

Milton conceded that he had never given any instructions to the South Carolina warehouse personnel to undertake the time-consuming chore of segregating the restocked returned goods or to tender them to Bankers' on-site representative. Milton, who is a certified public accountant and holds a masters degree in business administration, asserted at trial that although Braten continued to sell from its inventory it did not sell Bankers' portion of the inventory until January 1975 or later. In making this assertion Milton relied on an artificial accounting-type construct that the first goods out (i.e., sold) were Braten's goods and the last goods in (i.e., not sold) were Bankers. However, there was no evidence that Braten declined any sales and thus Braten's actual sales volume is indicative of market absorption capacity. The only evidence of distress sales indicates such sales occurred at the outset of the case rather than later.

There is no evidence that Bankers took control or possession of any restocked returned merchandise during, before or after Kantrowitz' tenure at the South Carolina warehouse. It is evident from Bankers' failure to take any action relative to restocked returned merchandise at a time when its employee was present on a daily basis at Braten's South Carolina warehouse that any oral communication Milton might have made on the subject to Bankers was ineffectual. Milton could not have been misled by Bankers' inaction as he could readily verify what was happening at the warehouse. Nor can Milton's failure to reduce to writing any "put" of the restocked returned merchandise to Bankers be excused.

On or about January 6, 1975, Bankers instituted an adversary proceeding to obtain relief from the automatic stay of former Bankruptcy Rule 11–44 so that Bankers might enforce its lien against the returned goods it had segregated at the South Carolina warehouse and sell the goods at an auction sale to be conducted by Martin Fein & Co. A schedule of the goods proposed to be sold was attached to the complaint. That sale was authorized by court order in mid-January, 1975. Kantrowitz, Bankers' on-site representation, returned to New York about the time this sale was conducted.

Thereafter Kantrowitz returned to the South Carolina warehouse in May 1975 to determine the extent of additional returned goods. Bankers instituted a second adversary proceeding in mid–1975 relative to the additional returned goods. Bankers was again authorized by court order to cause an auction to be conducted.

There is nothing in the papers relative to these two adversary proceedings which indicates that Braten ever brought to the court's attention at that time the question of the handling of the much larger volume of restocked returned merchandise. The first time that the issue has been identified as having been raised is in an affidavit of Milton sworn to December 10, 1980.

This court finds that the evidence does establish that a substantial portion of Braten's inventory on the petition date consisted of restocked returned merchandise. Braten admits to exercising dominion and control over that merchandise as it admits to selling that merchandise for not less than $500,000 and retaining the proceeds.

## DISCUSSION

Article 9 of the UCC governs secured transactions. The burdens which it imposes on secured creditors are many. This court holds that among those burdens are an obligation to account fully and accurately for the disposition of each account receivable as to which collection is undertaken. By virtue of the failure of this

secured creditor to do this, this court must deny part of the deficiency claim sought. Although the Debtor will no doubt view even this partial victory as a vindication after years of bitter litigation, this court's decision is neither a vindication of this debtor nor a condemnation of this secured creditor. That even partial victory on its legal claims for the Debtor and on its monetary ones for the Bank should be so long in coming is a reflection of the excess baggage with which the Debtor has cloaked its claims over the years and the Bank, its opposition.

Although the detail proffered during the eight-day trial was mind-numbing, it did reveal that Bankers initiated and carried out competently and in good faith an extensive collection procedure for Braten's accounts receivable. UCC § 9–502(2) states that the secured party undertaking to collect accounts receivable

"must proceed in a commercially reasonable manner and may deduct his reasonable expenses of realization from the collections."

The Debtor has asserted that Bankers did not act in a commercially reasonable fashion.

The term commercially reasonable must be understood in light of UCC § 9–507(2) as that section amplifies the meaning to be given to the term. UCC § 9–507(2) makes it clear that the mere possibility that a better collection result might have been obtained by use of different method does not establish that a collection effort was not done in a commercially reasonable manner.[14] Moreover, conformity with reasonable commercial practices among others collecting receivables would establish that a collection effort was done in a commercially reasonable manner.

The facts of this case reveal that Bankers took immediate steps upon calling its loan. It visited the Debtor's out-of-town warehouse. Meetings were held and a course of action developed. Within weeks

collection personnel had been assigned on a full-time basis to collect the Braten receivables. Collection folders were prepared for each account. Several notices were sent by Bankers to account debtors. The notices were followed up by telephone calls and further correspondence as required. Additional documentation was secured for Braten's files as required. Litigation was instituted when appropriate. The two collectors daily reviewed the financial and other results of their efforts with their supervisor and planned the following day's program. Substantial accounting and other records were kept. In order to manage chargebacks and to liquidate known returned merchandise, Bankers sent an employee to South Carolina who was stationed there full-time for several months to take charge of the merchandise. Progress reports were regularly prepared. The aggregate recovery using the Bank's figures was a respectable 79%.

Braten asserts that Bankers should have used more collectors, that the collectors should have been more experienced, and that they should have started collecting earlier. This kind of second-guessing is always possible. In none of these respects does this court find Bankers' conduct to exceed normal variation to the point of commercial unreasonableness.

UCC § 9–502(2) does more, however, than impose the burden of commercial reasonableness on the secured party. It also provides

"If the security agreement secures an indebtedness, the secured party must account[15] to the debtor for any surplus, and unless otherwise agreed the debtor is liable for any deficiency."

UCC § 9–504 which governs the disposition of collateral by sale and similar means contains an identical provision. This provision of UCC § 9–502(2) affords the statutory basis for the debtor, and the secured party in an appropriate case, to bring an action for an accounting.[16] Indeed, the right to

---

**14.** Although UCC § 9–507(2) is phrased in terms of sales, the principles are to apply as may be appropriate to other types of disposition.

**15.** The definition of "account" in UCC § 9–106 is inapposite.

**16.** It has been stated that if the requirement of commercial reasonableness as applied to the

an accounting was recognized in this case over ten years ago in the court's decision in *Bankers Trust Company v. Braten Apparel Corp. (In re Braten Apparel Corp.)*, 10 C.B.C. 122 (Bankr.S.D.N.Y.1976). The court then overruled a number of the Debtor's objections to the Bank's claim, including an objection to the Bank's claimed lien on merchandise sold by Braten prior to its Chapter XI filing but subsequently returned to it by the purchasers, and directed an accounting:

> "An accounting will reflect the amount already collected by the Bank from Braten's account debtors, what excessive interest, if any, was charged, and whether legal fees are allowed as part of the claim; on Braten's part, disclosure will be made as to secured property it holds and secured property it may have sold. By these accounting methods, the court will be able to ascertain the reach of the Bank's claim to the extent it is unsecured." 10 C.B.C. at 130.

Thereafter on August 18, 1986 an order (the "Accounting Order") was entered in accordance with the decision.

The Accounting Order specifies no standards by which the parties' accountings are to be judged. Nor does the UCC contain any specific provision dealing with the nature of the accounting. However, the UCC does supply the answer in another fashion. UCC § 1–103 provides that the principles of law and equity are to be applied unless displaced by particular provisions of the UCC. Thus, the sufficiency of the accounting proferred by Bankers must be tested by resort to the general law governing accountings.

Bankers has conceded its inability to account for its disposition of each of Braten's accounts receivable. It asserts that it is not required to do so and that it is sufficient that it has provided a summary statement. This court has found the summary statement proferred inadequate as a matter of fact.

■ As a matter of law, this court finds that a statement that accounts for the disposition of each account receivable is required. Without such a detailed accounting, the amounts collected, the credits given and write-offs made as well as the commercial reasonableness of the collection effort as to any individual account are unverifiable. Much of the burden the Debtor has caused this matter to impose on the parties and on this and order courts over the years [17] could have been avoided had such a detailed accounting been provided by Bankers.

The mere provision of masses of data is insufficient. The Debtor, for example, had its controller make extensive but unsuccessful efforts at reconciliation. More recently in connection with the trial, the Debtor retained an expert who spent days laboriously reviewing each of Bankers' collection files without being able to verify even the aggregate amount of the Bank's collections. An adequate roadmap in the

---

liquidation of accounts receivable means anything it must mean that the secured party is obligated to account to the debtor as to the final disposition of the receivables. *Fedders Corp. v. Taylor*, (hereafter *"Fedders"*), 473 F.Supp. 961, 977 (D.Minn.1979). Recordkeeping is an element of commercial reasonableness. However, there is a distinction between commercial reasonableness and the duty to account. Here the secured party maintained concurrent records that are adequate and would satisfy the burden for commercially reasonable records. Yet the secured party must also be able to account, which the secured party here is unable to do.

Although UCC § 9–501(3)(a) refers to an accounting for surplus proceeds, this court finds unpersuasive any distinction in the nature of the duty to account based on the existence or absence of a surplus. Proof of a deficiency is proof of the absence of a surplus and vice versa. Note should also be made of UCC § 9–505(2) which provides a procedure, not used by Bankers, by which a secured party can accept the collateral in discharge of the obligation. Only in that case would no accounting be required.

17. In addition to litigation in the bankruptcy court, there have been not less than a dozen complaints filed against the Bank relative to the guarantees given by Milton and others of the Bank's debt. See *Braten v. Bankers Trust Co.*, 60 N.Y.2d 155, 468 N.Y.S.2d 861, 456 N.E.2d 802 (1983) (Court of Appeals affirmed orders dismissing actions for alleged breach of promise by Bankers to continue credit to Braten until a specified date.).

form of a detailed accounting must be provided.

Under New York practice, a person required to provide an accounting is obliged to furnish a copy of the items of the account and may be precluded from offering evidence at trial of any items for which particulars have not been delivered. See N.Y.C.P.L. & R. 3042(c). At trial, each item making up the accounting must be established by competent proof. The burden of proving the correctness of the account rests on the person making it. See 1 C.J.S. (1985), Action on Account at §§ 25–26; and 1A C.J.S. (1985), Accounting at § 50(b).

An account is a detailed statement of the transactions. *Rosen v. Shear*, 23, 200 N.Y. S.2d 455 (S.Ct., Kings 1960). Almost one hundred years ago, it was stated in *Fred W. Wolf Company v. Salem*, 33 Ill.App. 614, 617 (1889) that

> "The law is settled and is sustained by reason, that the duty of an agent is not fulfilled * * * by reporting to his principal that he has spent a round sound [sic] of money in prosecuting his employment, and then swearing to the fact in a suit to recover the sum. His duty to keep and preserve true and correct statements of account is a necessary consequence of his duty to account. Mecham on Agency, Sec. 528. An account is a detailed statement: 1 Bouvier's Law Dictionary, 53. *It must be something which will furnish to the person having the right thereto, information of a character which will enable him to make some reasonable test of its accuracy and honesty, otherwise the obvious design of requiring it must be virtually fruitless.*" (Emphasis added).

See also, C.J.S. (1985), Account at 591–594.

The accountings proffered by Bankers do not provide information of a type sufficient to enable Braten to make some reasonable test of the accountings' accuracy and honesty, including by directed resort to the back-up data.[18] Nowhere in the Loan Agreement did Braten and Bankers specify, as they are permitted to by UCC § 9–501(3), the standards by which Bankers' obligation to account in the event it undertook to collect receivables was to be measured. See also UCC § 1–102(3). The parties did provide standards for the Debtor. Section 5(c) of the Loan Agreement states:

> "The Company will keep and maintain at the Company's own cost and expense satisfactory and complete records of the Accounts, including, but not limited to, a record of all payments received, all credits granted thereon, all merchandise returned and all other dealings therewith, and the Company will make the same available to the Bank at any reasonable time upon demand."

Although this provision is not contractually applicable to Bankers, it makes clear what records and information are reasonably required. Bankers simply cannot sustain its burden of proof in seeking a deficiency claim by offering a bare statement of the total amount of the collections made accompanied by the statement "trust me, it's correct."

This court hastens to add in light of the hostility between the parties that this court finds no evidence of any lack of good faith effort by Bankers in the recordkeeping area nor indeed any evidence that the summary statement offered is, in fact, other than substantially accurate.[19] Bankers shared much information with Braten. Bankers kept and generated many records relative to collections. Unfortunately as a result of a number of factors, including the incompatibility of Braten's and the Bank's computer systems, changes in personnel at

18. The *Fred W. Wolf Company* case makes clear the distinction between the accounting and the evidence which supports it as the court specially found it unreasonable to require the employee to provide receipts for train travel since it is "a fact universally known that a receipt for railroad fare is never asked or given." 33 Ill.App. at 617.

19. The evidence necessary to establish the absence of a surplus need not be the same as that required to establish the amount of a deficiency. This court is satisfied that Bankers in fact collected less than the net face amount of the receivables.

both Braten and the Bank, the number of accounts involved and the degree of hostility between the parties, Bankers proved in fact to be unable to account to the Debtor as to the disposition of each account receivable.

Bankers cannot lay blame for its failure on Braten's less than cooperative attitude.[20] Post-default collection efforts are often conducted in a hostile or indifferent atmosphere. Nothing Braten did precluded the Bank from setting up any recordkeeping system it wished, including the time-honored manually maintained ledger, that would have insured Bankers' ability to account for its handling of each account receivable.

■ UCC § 9–507 provides that the debtor has a right to recover from the secured party any loss caused by a failure to comply with the provisions of Part 5 of Article 9, which includes UCC § 9–502(2).[21] The Debtor urges that because of Bankers' inability to provide an accurate accounting that Bankers' entire deficiency claim must be disallowed, even the portion that was plainly unsecured from the outset. There are cases which deny any deficiency if there is any failure of compliance by the secured party.[22] See, e.g., *DeLay First National Bank and Trust Co. v. Jacobson Appliance Co.*, 196 Neb. 398, 243 N.W.2d 745 (1976). In *DeLay*, the court explained its position as follows:

> "The problem herein is that there was more than one sale, some of which can be upheld. We believe the intent of the Uniform Commercial Code would appear to mandate that the entire disposition of collateral by the secured party be viewed as one transaction, and that every aspect of that transaction be in accord with the requirements of the Uniform Commercial

Code. To adopt any other rule would place upon the court the sometimes impossible and time-consuming task of attempting to determine the amount of recoverable deficiency as well as the amount of unrecoverable deficiency." 243 N.W.2d at 751.

In the case of accounts receivable, this court finds no time-consuming burden in determining the unrecoverable deficiency. It is simply done by crediting the debtor with the face amount of any receivable not properly accounted for. Logic supports the proposition that the secured party could not collect more than the debtor was owed, which is the face amount of the receivables.

This court declines to follow the *DeLay* approach as it finds it inconsistent with the provisions and philosophy of Section 5 of Article 9. Well-separated authority declines to accept the *DeLay* court's approach. See, e.g., *Fedders, supra,* footnote 16 and the authorities cited, 473 F.Supp. at 977–8. See also *White and Sommers,* Uniform Commercial Code (2d Ed.1980), §§ 26–14 and 26–15. The court in *Fedders* stated its view:

> "While recognizing the line of authority which would deny any recovery to a secured party who violates the provisions of § 9–504(3) of the Court, this court believes that approach to be unduly punitive and therefore repugnant to the spirit of the Uniform Commercial Code. The policy of the Code as expressed in § 1–106 is clearly to allow full recompense to an aggrieved party by liberal application of the remedies provided in the Code and to avoid the assessment of penal damages. An automatic denial of a deficiency judgment as a result of any

**20.** Whether Bankers had a right under Section 5(c) of the Loan Agreement to insist that Braten maintain the records of Bankers' collections is a moot point. It is evident that Bankers would have had to make an express demand on Braten to do so, which Bankers never did.

**21.** UCC § 9–507(1) provides
"If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered

or restrained on appropriate terms and conditions. If the disposition has occurred the debtor * * * has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part."

**22.** The present Bankruptcy Code makes it clear that a creditor is a secured creditor only to the extent of the value of the collateral. See Bankruptcy Code § 506(a).

violation of the Code requirements would amount to a rejection of that policy." 473 F.Supp. at 978.

The New York cases do not follow the *Delay* approach. See, e.g., *Lincoln Rochester Trust Co. v. Howard*, 75 Misc.2d 181, 347 N.Y.S.2d 306 (1973); and *Federal Deposit Ins. Corp. v. Forte*, 94 A.D.2d 59, 463 N.Y.S.2d 844 (1983).

The loss occasioned by Bankers' inability to account is that Braten has been deprived of the ability of verifying how much less than the net face amount of each of its receivables totalling $2,238,553.57 Bankers actually collected and whether Bankers acted in a commercially reasonable fashion. Thus, it is appropriate on the present record to compute the value of this non-monetary loss at the difference between the total amount actually collected and the net face amount of the receivables and give credit to Braten against its obligation to Bankers in the net face amount of the receivables. The amount of Bankers' deficiency claim would then be calculated by subtracting $2,238,553.57 from $3,875,000, the minimum principal amount of Bankers' claim.

As to the returns that both parties acknowledge Bankers took possession of and sold, this court concludes that the evidence indicates that the proceeds, which were not substantial, from the second sale can be viewed entirely as proceeds received from the scheduled accounts receivable. As to the first sale, some of the proceeds could have been in excess of those net receivables if any of the 50–100 cartons of goods on hand when Kantrowitz arrived at the warehouse in late September had been received and credited before the ageing report was prepared. Because the amount would not be significant, this court concludes that no credit need be given to Bankers above the amount already provided for the receivables.

Braten also asserts that Bankers should be denied a deficiency because Bankers failed to liquidate returned merchandise that had been restocked. The Loan Agreement granted Bankers a security interest in, *inter alia,* "all rights and liens of the Company [Braten] in and to the merchandise, including returned or repossessed merchandise."

■ By custom and usage between the parties prior to default, Braten restocked returned merchandise and it was commingled with the balance of the inventory. UCC § 9–315(1) provides that a security interest in goods continues notwithstanding commingling in a mass if the goods are so processed or commingled that their identity is lost in the mass. If more than one security interest attaches to the mass, the security interests rank equally according to the ratio that the cost of the goods to which each interest originally attached bears to the cost of the total. Thus, Bankers had a security interest in the undifferentiated mass of Braten's inventory as it existed at the time of the Chapter XI filing to the extent of the restocked returned merchandise. Merely permitting the restoration to stock of returned goods did not constitute a waiver or invalidate the security interest. See UCC § 9–205. Braten has conceded the existence of the security interest by asserting Bankers' failure to act in a commercially reasonable manner relative to the unsegregated returned merchandise.

■ Following the Chapter XI filing, the mass comprising its merchandise inventory remained in Braten's custody. There is no credible evidence that Braten ever undertook to tender to and to segregate, physically or on paper, for the benefit of Bankers, that portion of its commingled mass of inventory which represented returned merchandise on which Bankers held a lien. Bankers never made any demand for that inventory nor did it take custody of it. Apparently Bankers was under the mistaken impression that its lien only applied to returned merchandise that remained segregated at the time the petition was filed or was returned thereafter.

The Debtor was directed to account to the Bank for the secured property it held as well as that it may have sold by the Accounting Order. The record at trial makes it clear that Braten is unable to

fulfill its duty to account in detail to Bankers for the restocked returned goods and their disposition. Since an accounting is required and no other basis appears in the record beyond the even more conclusory statements of Braten's controller, this court accepts Milton's estimate of $500,000 as the best available evidence of the proceeds realized from the sale of the restocked returned merchandise and holds that Bankers is entitled to recover this amount from Braten.

This court finds it unnecessary to address the Debtor's technical objections to Bankers' proof of claim as they go to form rather than substance. The substance of Braten's proof of claim is amply tested by the required accounting. The prophylactic necessity of insisting on a proper accounting is apparent in this case. Far from unduly burdening a commercial transaction, this court has concluded that the strict requirement it applies promotes the purpose and policy of the UCC to simplify and clarify the law governing commercial transactions. See UCC § 1–102(1) and (2)(a). See also Par. 1 of the Official Comment to UCC § 1–102 ("The text of each section should be read in the light of the purpose and policy of the rule or principle in question, as also of the Act as a whole, and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved.").

The parties are directed to agree on the form of an appropriate order. In the absence of agreement, either party may settle a proposed order on 10 days' notice.